UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN J. O'ROURKE,

          Plaintiff,

   v.

NORTHERN CALIFORNIA ELECTRICAL
WORKERS PENSION PLAN, et al.,

          Defendants.

Case No.  16-cv-02007-WHO

**ORDER RE CROSS MOTIONS FOR
PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 26, 29

## INTRODUCTION

This action arises out of the denial of plaintiff John J. O'Rourke's application for early
retirement benefits under the Northern California Electrical Workers Pension Plan.  The Board
denied O'Rourke's application because it interpreted "prohibited employment" to include
O'Rourke's current work as Vice President of the International Brotherhood of Electrical
Workers, Ninth District.  The parties filed cross-motions for partial summary judgment on Claim
One for benefits pursuant to the Plan under ERISA section 502(a)(1)(B), and both sides present
plausible interpretations of the ambiguous Plan.  The standard of review is abuse of discretion, and
I conclude that the Board did not abuse its discretion interpreting the prohibited employment
provision.  O'Rourke's motion is DENIED and defendants' cross-motion is GRANTED.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.  The Pension Plan

Defendant Northern California Electrical Workers Pension Plan (the "Plan") is a
multiemployer defined benefit pension plan.  Complaint ("Compl.") (Dkt. No. 1) ¶ 5; Answer

United States District Court
Northern District of California

United States District Court
Northern District of California

("Ans.") (Dkt. No. 15) ¶ 5; Administrative Record[1] ("AR") 204.  The parties agree that the Plan is covered by the Employee Retirement Income Security Act of 1974 ("ERISA").  The Plan provides for three types of benefits:  (1) normal pension; (2) early pension; and (3) disability pension.  AR 197.  Pension benefits are paid from the Northern California Electrical Workers Pension Trust to which employers under the Plan contribute.  AR 373.

Defendant Board of Trustees of the Northern California Electrical Workers Pension Trust (the "Board") has an equal number of Management Trustees and Labor Trustees appointed respectively by the San Francisco Electrical Contractors Association, Inc., and Local 6 of the International Brotherhood of Electrical Workers ("Local 6").  AR 374, 378, 382.  The Plan vests the Board with "the exclusive power and discretion to interpret the provisions of the Plan and any rules issued under the Plan, and to determine all questions arising under the Plan including eligibility for benefits."  AR 218.  The "Plan's provisions are designed and intended to comply with the Code and ERISA, as amended, and the construction and interpretation of the Plan shall be consistent with the Code, ERISA, and the Trust Agreement."[2]  AR 218.  The Board "may amend or modify [the] Plan, provided that no amendment or modification may reduce any accrued benefit except as permitted or required by ERISA and the Code, including regulations thereunder."  AR 218.

The Plan provides for suspension of early retirement benefits when a retiree works in "prohibited employment."  AR 206.  It defines "prohibited employment" before normal retirement age as "the performance of services in any capacity in the Electrical Industry."[3]  AR 207.

---

[1] The Administrative Record is comprised of certain exhibits containing the Bates number prefix "NCEW PP-O'Rourke" and attached to the Declarations of Teresa Renaker (Dkt. Nos. 27, 34) and the Declaration of Clarissa Kang (Dkt. No. 30).

[2] The Plan defines the "Code" as the Internal Revenue Code of 1986, and "ERISA" as the statute "as applied by regulations issued thereunder."  AR 195.  The "Trust Agreement" refers to the Northern California Electrical Workers Pension Trust.  *See* AR 370.

[3] The Plan provides a narrower definition of prohibited employment *after* normal retirement age: "'Prohibited Employment' . . . means the performance of services of 40 hours or more during the month: (1) in the ten San Francisco Bay Area counties . . .; (2) in work the type performed by Employees covered by the Plan on date the Participant's pension commenced . . . ; and (3) requiring directly or indirectly the use of the same skills employed by Employees on the date the Participant's pension commenced . . . , including any supervision of employees in the same trade

2

"Electrical Industry" is defined as "all branches of the Electrical Trade in the United States."  AR 195.  The Plan does not define "Electrical Trade."

> The Plan contains four exceptions to the Prohibited Employment rule, including:
> work (i) as a private or public building or electrical inspector, (ii) as an instructor in a Taft-Hartley Trust apprentice and training program, (iii) in sales of electrical equipment or products or (iv) in the manufacturing or marketing of electrical or electronic products and systems which does not substitute for on-site fabrication protected or sought to be protected under a Collective Bargaining Agreement.

AR 207.

> Although not a part of the Plan, the summary plan description ("SPD")[4] notes, "Prohibited Employment is interpreted in the broadest manner."  AR 297.  It further states:
> Prohibited Employment includes, but is not limited to, (1) work in employment of the type performed by Employees covered by the Plan whether or not under a Collective Bargaining Agreement, also known as Covered Employment; (2) work which requires directly or indirectly the use of the same skills used by Employees covered by the Plan on the date the pension became effective [sic]; (3) work in employment for compensation or wages of any kind or for profit in the Electrical Industry; (4) work for profit as an owner or partner in any business directly or indirectly connected with the Electrical Industry; and (5) work where you supervise Employees in the same trade or craft or directly or indirectly use the same skills as Employees covered by the Plan on the date you retire.  It also includes any employment with a contributing Employer or any employment under any Collective Bargaining Agreement to which the Union is party, or any employment with the Union.[5]
>
> The term Electrical Industry means all branches of the Electrical Industry.  This includes working as a supervisor, estimator, salesman, consultant, or self-employed in any branch of the Electrical Industry, or any other work involving any electrical knowledge you have acquired as a Participant.

AR 297.

---

or craft or directly or indirectly using the same skills as Employees covered by the Plan on the date the Participant's pension commenced[.]"  AR 207.

[4] The SPD states that if there is "any ambiguity or conflict between [the SPD] and the Plan, the Plan will govern."  AR 235.

[5] "Union" is defined elsewhere in the SPD and in the Plan as "Local 6 of the International Brotherhood of Electrical Workers" and also referred to as "IBEW Local 6."  AR 196.

United States District Court
Northern District of California

### B.  O'Rourke's Covered Employment

O'Rourke worked as an electrician for approximately 20 years and then worked for Local 6 as a "Business Manager/Financial Secretary" from July 1999 to March 2012.  Ans. ¶ 8.  While working for Local 6, O'Rourke served as a Labor Trustee on the Board and acted as Chair for several years.  *Id.* ¶ 8.  Both positions—electrician and local union official—were covered employment and established O'Rourke's 30 years of service to qualify him for an early retirement pension under the Plan when he turned 55 years old.

#### 1.  Plan Amendments While O'Rourke was on the Board

During O'Rourke's time on the Board, two amendments to the Plan's prohibited employment provisions were adopted.  AR 18, 53.  In 2002, the Board adopted an amendment to eliminate case-by-case waivers to the suspension of benefits rules for direct management positions, such as project management, estimator, and human resources positions.  AR 18.  The Board adopted this amendment because it "recogniz[ed] that the . . . suspension rules which provided for waivers for direct management positions created an inequity by allowing 'alumni' employees the opportunity to draw pension benefits and retiree health coverage when bargaining unit employees are prohibited from doing so."[6]  AR 18.  In 2006, the Board amended the prohibited employment provision to include the four enumerated exceptions.  AR 50, 53.

#### 2.  O'Rourke's Review of Benefit Suspension Cases

Additionally, O'Rourke reviewed with the other trustees several benefit suspension cases while on the Board.  AR 54-66.  For instance, the Board denied a participant's request for a waiver to work as a sole proprietor using AutoCAD, computer-assisted drafting.  AR 56.  During the meeting reviewing this request, O'Rourke noted that this type of work for electrical contracts did require knowledge of electrical work.  AR 56.  The Board also denied requests for waivers to work as a project manager at Mitchell Engineering (AR 56-57) and as a Mechanical, Electrical & Plumbing Superintendent for a general contractor (AR 60).

---

[6] The Plan defines "alumni employee" as "an individual employed in a nonbargaining unit position with an Employer who was previously employed for an Employer under a Collective Bargaining Agreement; provided, however, that such term shall not include any proprietor or partner of an unincorporated employer."  AR 195.

### 3.  September 2010 Board Meeting

At the September 23, 2010 Board meeting, O'Rourke "proposed consideration of a change to the suspension benefits rules that would provide an exemption from prohibited employment for work performed for Local or National AFL-CIO affiliates such as the IBEW, Labor Council, State Associations, and Building Trades Council, as well as the ability to enter into alumni subscription agreements that would allow non-retired Participants who work for those entities to continue participating in the [Trust]." AR 82.  O'Rourke recommended that the Board approve the proposal at that meeting "with review of the Plan and Trust documents by Co-Counsel to determine what changes, if any, are required to accomplish this." AR 82.  The meeting minutes state, "M/S/C to concur with the recommendation." AR 82.

O'Rourke's declaration, submitted to the Board at a later date, states, "My 2010 proposal was unanimously accepted.  As the Chair of the Board of Trustees, I did not make a motion or vote on the motion." AR 359.  Additionally, the "Plan Administrator and Trust counsel stated at the meeting in 2010 that they did not believe an amendment would be required." AR 359.

### C.  O'Rourke Leaves Local 6 to Work for the IBEW

In February 2012, O'Rourke gave notice that he intended to leave his position with Local 6 to work as a representative for the International Brotherhood of Electrical Workers, Ninth District ("IBEW Ninth District"). Ans. ¶ 9; AR 98.  At that time, the Plan Manager emailed Plan counsel, noting that no action had been taken following the September 2010 meeting and requesting counsel prepare something for the next Board meeting. AR 98.  In March 2012, O'Rourke left his position with IBEW Local 6. AR 361.

In April 2012, Plan counsel provided a draft Plan amendment, adding an exception to prohibited employment for work "as an employee of the IBEW International Union." AR 102, 104.  The meeting minutes state that at the September 2010 meeting, "the Trustees approved the concept of a change to the suspension of benefits rules that would provide an exemption from prohibited employment for work performed for Local or National AFL-CIO affiliates, such as the IBEW," and "Co-Counsel was asked to determine what changes, if any, are required to accomplish this." AR 102.  The minutes further reflect the need for an amendment:

> At that time [September 2010], the Trust was waiting for comments
> from the IRS on the restated plan that was submitted in proposed
> form and not yet formally approved by the Trustees. This change
> would have been incorporated into the document along with any
> other changes determined by the IRS prior to its adoption.
> However, the Plan document was unexpectedly approved as
> submitted and, as a result, will now require an amendment to
> accomplish the action that was taken in September 2010.

AR 102. The Board tabled this matter. *Id.*

On March 13, 2014, Plan counsel drafted a memo addressing "whether a plan participant's employment performing administrative or organizing work for a labor union (such as the IBEW International Office) or an employers association (such as NECA) constitutes 'Prohibited Employment' and is therefore grounds for suspension of early retirement benefits under [the Plan] as currently written." AR 115. The March 2014 Memo concluded that such work was not prohibited employment, explaining:

> Reference to the exceptions listed in the Plan Document, the
> discussion of "Prohibited Employment" in the [SPD], and relevant
> ERISA case law and regulations all indicate that term 'Electrical
> Trade' is properly interpreted as limited to performing services
> involving the technical skills and knowledge of an electrician.
> Administrative or organizing work for a labor union or employers'
> association cannot be said to be performance of 'Electrical Trade'
> services. Because the Plan's current definition of 'Prohibited
> Employment' does not prohibit such work, no amendment to the
> plan is necessary to clarify that such work is permitted.

AR 115.

On March 18, 2014, the Board reviewed the March 2014 Memo. AR 119. Two Labor Trustees "expressed strong disagreement with the legal opinion." *Id.* Trustee John Doherty stated that "because Local 6 participates as a covered employer in the Plan under a subscription agreement, that type of employment for Local 6, or any other IBEW for that matter, is considered 'covered employment' and is, therefore subject to suspension of benefits." *Id.* He considered allowing a participant to receive a local pension while working for the International union as "double dipping." *Id.*

Trustee Matthew Bamberger pointed out that the Plan "defines 'prohibited employment' in the broadest sense" and that "in early 2000, the Plan was amended to allow administrative and case-by-case exemptions from prohibited employment, but that these exemptions were later eliminated because of the unfairness of allowing some participants to continue working while

drawing their pensions, when others were prohibited from doing so." AR 120. He was concerned that "the inconsistent or new interpretation . . . would result in unfairness or inequity if individuals are allowed to draw a pension while working for the International given the types of employment for which exemption requests have been denied since that time." *Id.* The Board requested counsel to research the matter further and look into the Plan's past practices in dealing with suspension of benefits. *Id.*

### D.  O'Rourke Applies for Early Pension Benefits and is Denied

In June 2014, O'Rourke submitted an application for unreduced early retirement pension benefits to begin in September 2014. AR 361-62. Neither party disputes that O'Rourke met the criteria: 55 years old and 30 years of service. Worried about a potential problem with O'Rourke's employment with the IBEW Ninth District, the Plan Manager brought O'Rourke's application to the Board.

In August 2014, Plan counsel drafted a follow-up memo reviewing decisions on prohibited employment from meeting minutes going back approximately 15 years. AR 121. Counsel concluded:

> In view of these decisions and history of Board discussions, we agree that at times the Board has interpreted the definition of Prohibited Employment more broadly to include work that may not specifically bear upon or utilize skills and experience obtained by work in the electrical trade. For that reason, we do not believe that the Board should categorically exempt any work unless it satisfies one of the existing four exceptions in the Plan. Rather, as has been the practice in all other cases, we think the best course is for the Board to base its determination on careful consideration of all the facts and circumstances that may be submitted regarding the nature of the work in question.

*Id.* On August 14, 2014, the Board reviewed the August 2014 Memo and authorized the Plan Manager to request from O'Rourke a written job description and a statement explaining why he believed his work at IBEW was not prohibited under the Plan. AR 127.

Around November 2014, O'Rourke became the Vice President of the IBEW Ninth District. Ans. ¶ 9; AR 359. In response to the Board's request, O'Rourke submitted a letter noting that he served as Vice President of the IBEW Ninth District, which is comprised of six states, 65 local

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1   unions, and 129,000 members.[7]  AR 348.  O'Rourke also stated, "My duties are purely

2   administrative and do not require, directly or indirectly, the use of the same skills employed by

3   electricians in an electrical trade or craft.  Furthermore, my responsibilities do not include

4   supervising employees in said trade or craft.  My employment . . . does not require the technical

5   skills of an electrician."  AR 348.  In December 2014, the Board considered O'Rourke's letter, but

6   did not reach a decision.  AR 349.

7        In January 2015, O'Rourke's attorney wrote to the Plan demanding it pay O'Rourke's

8   pension benefits.  AR 149-51.

9         In March 2015, the Board met and decided to deny O'Rourke's application "because the

10  work he is performing does not meet one of the exceptions to the suspension of benefits provisions

11  of the Plan."  AR 168.  On March 27, 2015, Plan counsel sent O'Rourke a letter detailing reasons

12  for finding that his employment constituted "prohibited employment."  AR 350-52 ("Application

13  Denial Letter").  The Application Denial Letter noted that the Plan provides only four limited

14  exceptions to the prohibited employment rule and that the action taken in September 2010 was

15  insufficient to implement the proposed exception because no amendment had been adopted.  AR

16  350-51.  The letter further explained:

17          The Plan . . . does not limit application of the suspension rule to early retirees who
            continue to use technical electrician skills in their post-retirement work. Rather, it
18          requires suspension of benefits whenever an early retiree, not falling within any of
            the four enumerated exceptions, is performing services in any capacity in the
19          Electrical Industry. Applying this broad language, the Board has determined that
            work as a marketing representative or a project manager, or in other positions
20          which likewise do not entail the use of the technical skills of an electrician,
            nevertheless constitutes the performance of services in the Electrical Industry, and
21          is thus prohibited employment. That some of those positions may require an
            electrician's background cannot be taken to mean that the performance of services
22          in the Electrical Industry is constrained to those positions that require the skills of
            an electrician. The position Mr. O'Rourke holds, Vice President of the IBEW Ninth
23          District, plainly contemplates the performance of services of some capacity in the
            Electrical Industry.
24
    AR 351.
25

26

27  ────────────────────
    [7] The administrative record contains sufficient information regarding O'Rourke's position with the
28  IBEW Ninth District.  Therefore, defendants' Request for Judicial Notice (Dkt. No. 31) of a
    printout of the homepage of the IBEW Ninth District is irrelevant and DENIED.

The letter also rejected O'Rourke's argument that "work for the International does not constitute work in the 'Electrical Industry' at all, as it is not work in which 'employers maintaining the Plan are engaged." *Id.* Instead, the letter found that is not the way "industry" is commonly used, noting the IBEW and National Electrical Contractors Association

> have acted as industry partners for over a century, not only in the administration of their collective bargaining agreements, but also in electrical construction and marketing, in training and certification of electricians, in efforts to change the laws and regulations governing electrical contracting, and much more.

*Id.* Lastly, the letter stated that ERISA regulations regarding suspension of benefits after normal retirement age (65 years old) were inapplicable to suspension of early retirement benefits. *Id.*

### E.  O'Rourke Appeals and is Denied Again

On July 10, 2015, O'Rourke appealed the denial of his claim for benefits. AR 332-37. In support of his appeal, O'Rourke submitted a declaration describing his job duties as the Vice President of the IBEW Ninth District, stating:

> My job is to promote the IBEW's mission of organizing workers into local unions, securing reasonable terms of employment including adequate pay and work hours, cultivating feelings of friendship among workers, and elevating the moral, intellectual and social conditions of members and their families. It is an administrative position.
>
> I do not perform electrical work, supervise or oversee electrical work, teach electricians, work with electrical contractors, draft electrical specifications, or sell, construct, rent or repair electrical components in my current position.
>
> My position with the IBEW does not require any manual or mechanical skill.

AR 359.

The Board met on August 11, 2015, and discussed O'Rourke's appeal letter and Plan counsel's "concurrence that there is no basis for changing the decision." Renaker Decl., Ex. E (Dkt. 27-5) at 10. The Board upheld the denial of O'Rourke's application for early retirement benefits. *Id.*

On September 11, 2015, Plan counsel sent a letter to O'Rourke's attorney detailing the reasons for denying his appeal. AR 354 ("Appeal Denial Letter"). Noting that "Electrical Trade" could be interpreted in multiple ways, counsel stated, "This Board has chosen to apply the term

United States District Court
Northern District of California

broadly, such that 'Electrical Trade' . . . means any service in any capacity in the U.S. electrical industry." AR 354. The letter further explained, "The reason for this interpretation is partly to prevent retirees from simultaneously receiving pension benefits and working in a position that might displace a non-pensioner, but also avoid providing an incentive for experienced electricians to leave fieldwork for an administrative position in the industry and the substantial benefit costs that would go with it." AR 354-55.

The Appeal Denial Letter also states that the reason for the four exceptions to the prohibited employment rule "is based on a recognition that it is in the electrical industry's general interest to allow an early retiree to perform certain ancillary functions for which it might otherwise be difficult to find qualified individuals." AR 355.

Next, the letter asserts that its interpretation of "trade" is in line with the plain meaning of the word. AR 355. For example, two ways that Webster's New World Dictionary (Third College Edition) defines "trade" is "a means of earning one's living, occupation, work, or line of business" and "all the persons or companies in a particular line of business of work." AR 355. Under this meaning, the Board found:

> IBEW Service is service within the Electrical Trade because Mr. O'Rourke would be working for a union whose function is to provide direct representation and support for workers within the electrical trade. It does not matter whether IBEW Service is administrative or actively working as an electrician; the "industry" and the "trade" refers to both types of services. Therefore, unless an exception applies, IBEW Service would constitute Prohibited Employment.

AR 355. The letter notes that O'Rourke's current employment does not fit within any of the four exceptions. AR 355-56.

Additionally, the letter addresses O'Rourke's September 2010 proposal. "The Board . . . did not treat this adopted motion as an amendment. It did not contain an effective date, was not clear as to its scope (for example, would it cover all AFL-CIO affiliates?), and wasn't clear as to whether the action itself was an amendment." AR 356. Instead, the Board determined at its March 2015 meeting that the recommendation required an amendment. AR 356. Therefore, "the motion that carried in September 2010 was an agreement by the labor and management trustees, in

concept, to adopt an amendment in the future, generally consistent with the recommendation." AR 356. However, no amendment was ever adopted.

## II. PROCEDURAL BACKGROUND

On April 15, 2016, O'Rourke filed his complaint asserting two claims under the Employee Retirement Income Security Act of 1974 ("ERISA"). Complaint (Dkt. No. 1). The first claim is for benefits pursuant to the Plan under ERISA section 502(a)(1)(B). The second claim is for breach of fiduciary duty under ERISA section 502(a)(3). On June 14, 2016, defendants filed their answer. (Dkt. No. 15). The parties then filed cross-motions for partial summary judgment on Claim One. O'Rourke's Motion for Summary Judgment ("O'Rourke's MSJ") (Dkt. No. 26); Defendants' Opposition and Cross-Motion for Summary Judgment ("Defendants' MSJ") (Dkt. No. 29).

## LEGAL STANDARD

Under Section 502 of ERISA, a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A claim of denial of benefits in an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under the *de novo* standard, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

However, when the plan grants the plan administrator discretion to determine eligibility for benefits or to construe the terms of the plan, then a court may only review the administrator's decision regarding benefits for an abuse of discretion. *Id.* In such a situation, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 706 (9th Cir. 2012) (internal quotation

marks omitted).  "[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion."  *Abatie*, 458 F.3d at 970.

## DISCUSSION

The Plan provides for suspension of early pension benefits when a pensioner works in "prohibited employment," meaning "the performance of services in any capacity in the Electrical Industry."  The Plan defines "Electrical Industry" as "all branches of the Electrical Trade in the United States," but does not define "Electrical Trade."  O'Rourke worked for approximately 30 years as an electrician and a local union officer to qualify him for an early retirement pension under the Plan.  He now works as the Vice President of the IBEW Ninth District.  The Board determined that O'Rourke's current union position constitutes "prohibited employment" and denied O'Rourke's application for early retirement benefits after it. I must decide whether the Board abused its discretion when it interpreted "prohibited employment" to include O'Rourke's employment with the IBEW Ninth District.

## I.  STANDARD OF REVIEW

The parties agree that an abuse of discretion standard applies.  "Where an ERISA Plan grants discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a plan administrator's interpretation of a plan is reviewed for abuse of discretion."  *Tapley v. Locals 302 and 612 of the Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013) (internal citations and quotation marks omitted).  Here, the Plan states that the "Board has the exclusive power and discretion to interpret the provisions of the Plan and any rules issued under the Plan, and to determine all questions arising under the Plan including eligibility benefits."  AR 218.

Under this standard, the Board's "interpretation of Plan language is entitled to a high level of deference and will not be disturbed unless it is not grounded on *any* reasonable basis."  *Tapley*, 728 F.3d at 1139 (internal quotation marks omitted; original emphasis).  "Deference is particularly weighty where . . . the Plan 'confers broad power on the administrators to determine eligibility for benefits under the plan,' and the interpreted language is ambiguous."  *Id.*  The Board's

United States District Court
Northern District of California

United States District Court
Northern District of California

1   interpretation must have "rational justifications," but it does not need to be the interpretation that I

2   would have reached.  *Id.* at 1139-40.

3         "When reviewing interpretive challenges for abuse of discretion, the Court closely reads

4   contested terms and applies contract principles derived from state law, guided by the policies

5   expressed in ERISA and other federal labor laws."  *Id.* at 1140 (internal citations and quotation

6   marks omitted).  The Board abuses its discretion when it construes provisions of the Plan in a way

7   that (i) "clearly conflicts with the plain language," (ii) "renders nugatory other provisions of the

8   Plan," or (iii) "lacks any rational nexus to the primary purpose of the Plan." *Id.* (internal citations

9   and quotation marks omitted).

10        Also, "[i]f a plan administrator labors under a conflict of interest, the court must consider

11  that conflict of interest as a factor in determining whether the administrator abused its discretion."

12  *Anderson v. Suburban Teamsters of N. Illinois Pension Fund Bd. of Trustees*, 588 F.3d 641, 648

13  (9th Cir. 2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)).  "A conflict

14  of interest exists 'where it is the employer that both funds the plan and evaluates the claims.'"  *Id.*

15  O'Rourke acknowledges no such conflict exists here.  O'Rourke's Reply (Dkt. No. 33) at 6.  As in

16  *Anderson*, the Plan is a multi-employer plan funded by the participating employers (not the

17  Trustees) and the Board "consists of both employer and employee representatives, who determine

18  employee eligibility under the Plan.  Both sides are at the table," and the Board did not have a

19  conflict of interest.  *Id.*; AR 374, 378, 382.

20  **II.  WHETHER THE BOARD ABUSED ITS DISCRETION**

21        **A.  The Interpretation Does Not Conflict with the Plan's Plain Language**

22        The inquiry begins with the Plan's plain language, "interpreting it in an ordinary and

23  popular sense as would a person of average intelligence and experience."  *Tapley*, 728 F.3d at

24  1140 (internal quotation marks omitted).  The Plan defines "prohibited employment" before

25  normal retirement age as "the performance of services in any capacity in the Electrical Industry."

26  AR 207.  "Electrical Industry" is defined as "all branches of the Electrical Trade in the United

27  States."  AR 195.  The term "Electrical Trade" is not defined or mentioned elsewhere in the Plan.

28

O'Rourke argues that the Board's decision denying his claim for benefits conflicts with the plain meaning of "Electrical Trade."  O'Rourke's MSJ at 12.

"An ambiguity exists when the terms or words of a pension plan are subject to more than one reasonable interpretation.  In fact, only by excluding all alternative readings as unreasonable may we find that a plan's language is plain and unambiguous."  *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000) (internal citation omitted).  The parties offer reasonable competing interpretations of "Electrical Trade," demonstrating that, as used in the Plan, the term's meaning is ambiguous.

O'Rourke acknowledges that "trade" has multiple meanings, but argues that, in the context of the Plan, it unambiguously means "an electrical occupation."  O'Rourke's MSJ at 12.  As support, O'Rourke points to the March 2014 Memo, which cited the Merriam-Webster Dictionary Online definition of "trade" as "an occupation requiring manual or mechanical skill."  AR 116. Also, O'Rourke urges that this definition is in line with case law interpreting the term "trade" in the context of normal retirement benefits.  *See Smith v. CMTA-IAM Pension Trust*, 654 F.2d 650, 659-60 (9th Cir. 1981) (reversing dismissal of ERISA claim where more information was needed to determine whether post-retirement work involved overlapping skills to constitute the "same trade or craft"); *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 650 (8th Cir. 2009) (finding abuse of discretion where Plan interpreted "trade or craft" in conflict with ERISA and relying on federal regulations to define "trade or craft" "by the skills he actually used while employed").  Because O'Rourke is not using the technical skills of an electrician, he contends that he is not working in the "Electrical Trade."

The defendants respond that the Board's interpretation is reasonable and not in conflict with the plain language.  Defendants' MSJ at 16-17.  They note that Black's Law Dictionary defines "trade" as "[a]n occupation or regular means of livelihood and is business one practices or the work in which one engages regularly."  Also, the Appeal Denial Letter references the Merriam-Webster Dictionary definition of "trade" as "a means of earning one's living, occupation, work, or line of business" or "all the persons or companies in a particular line of business or work."  AR 355.  Relying on this definition, the Board found:

> IBEW Service is service within the Electrical Trade because Mr. O'Rourke would be working for a union whose function is to provide direct representation and support for workers within the electrical trade. It does not matter whether IBEW Service is administrative or actively working as an electrician; the "industry" and the "trade" refers to both types of services. Therefore, unless an exception applies, IBEW Service would constitute Prohibited Employment.

AR 355. From the Plan's plain language, the Board's interpretation that "Electrical Trade" included administrative positions for the IBEW Ninth District was also reasonable.

The parties identify other sources for the interpretation of "Electrical Trade." O'Rourke points to the IBEW Constitution to define "branches." O'Rourke's MSJ at 13. The constitution states, "Electrical workers shall be organized under five general branches of the I.B.E.W., namely: Outside and Utility Workers; Inside Electrical Workers; Communications Workers; Railroad Electrical Workers; and Electrical Manufacturing Workers." Dkt. No. 27-7 at 79. O'Rourke reasons that "a 'branch of the electrical trade' refers to a subset of electrical workers." O'Rourke MSJ at 13. This is one possible interpretation, but neither party has cited any provision in the Plan incorporating the IBEW Constitution. And the IBEW Constitution governs the union only; it does not apply to any of the Plan's covered employers or the Board. Therefore, the Board was not required to interpret "Electrical Trade" in this manner.

O'Rourke also points to the Department of Labor regulations interpreting ERISA provisions governing the suspension of normal pension benefits. O'Rourke's MSJ at 13. The regulations define "trade or craft" as:

> (A) a skill or skills, learned during a significant period of training or practice, which is applicable in occupations in some industry, (B) a skill or skills relating to selling, retailing, managerial, clerical or professional occupations, or (C) supervisory activities relating to a skill or skills described in (A) or (B) of this paragraph (c)(2)(ii). For purposes of this paragraph (c)(2)(ii), the determination whether a particular job classification, job description or industrial occupation constitutes or is included in a trade or craft shall be based upon the facts and circumstances of each case. Factors which may be examined include whether there is a customary and substantial period of practical, on-the-job training or a period of related supplementary instruction.

29 C.F.R. § 2530.203-3(c)(2)(ii). Under the "skills" test described in the regulations, O'Rourke emphasizes that he does not rely on the same technical skills that he used as an electrician in his administrative role at IBEW Ninth District.

United States District Court
Northern District of California

1   Defendants respond that the federal regulations are inapplicable here because ERISA

2   provisions only cover normal retirement benefits, not early retirement benefits.  Defendants' MSJ

3   at 15.  Therefore, defendants argue, the Board may adopt a broader definition of "trade" than the

4   regulations.  Even if the "skills" test does apply, defendants contend that O'Rourke's duties and

5   skills used in his position with IBEW Local 6 are the same as those for his position with IBEW

6   Ninth District.  Reply at 7.  They assert that the skills "need not be mechanical in the nature of an

7   electrician to qualify as 'trade'" because the regulations' definition of trade includes skills related

8   to "managerial, clerical or professional occupations."  Defendants' Reply at 13.

9   O'Rourke objects that there is no evidence in the administrative record regarding his job

10   duties at IBEW Local 6.[8]  But defendants note that the other Labor Trustees would have generally

11   known what O'Rourke's position required because they also worked as union officers.

12   Defendants' Reply at 12-13.  The meeting minutes reflect that Trustee Doherty served as Business

13   Manager/Financial Secretary for Local 6—the same position that O'Rourke held.  AR 126.   The

14   IBEW Constitution describes the duties of a local union Business Manager to include, among

15   other things, "organizing his jurisdiction, . . . establishing friendly relations with employers, and . .

16   . protecting the jurisdiction of the IBEW."  Dkt. No. 27-7 at 57.  In comparison, O'Rourke's

17   declaration provides his IBEW Ninth District job responsibilities:

18
19   My job is to promote the IBEW's mission of organizing workers
     into local unions, securing reasonable terms of employment
     including adequate pay and work hours, cultivating feelings of
     friendship among workers, and elevating the moral, intellectual and
20   social conditions of members and their families.

21   AR 359.  Plus, the IBEW Constitution provides that the local union Business Manager and the

22   International Vice President for that district work together on certain occasions.  For instance, the

23   International Vice President "shall hold a progress meeting yearly, with the business manager and

24   delegates from each [local union] in their districts."  IBEW Constitution, Art. VII, Section 1 (Dkt.

25

26   ───────────────

27   [8] O'Rourke also argues that this is a post-hoc rationalization that should be disregarded.  It is true
     that the Application Denial Letter and Appeal Denial Letter do not include this rationale; rather,
     they insist prohibited employment is not limited to jobs involving the technical skills of an
28   electrician.  But this rationale is reflected in the administrative record, including in the Board
     meeting minutes (AR 119-120) and in one of the Trustee's emails to Plan counsel (AR 187).  (Dkt.

No. 27-7 at 20).  From these descriptions, it appears that O'Rourke's IBEW Local 6 position and IBEW Ninth District position involve at least some key overlapping duties and skills, such as organizing work.

This finding also comports with the Plan's narrower definition for prohibited employment after normal retirement age, which "means the performance of services of 40 hours or more during the month:  (1) in the ten San Francisco Bay Area counties . . . ; (2) in *work of the type performed by Employees covered by the Plan* on the date the Participant's pension commenced (or would have commenced but for this provision; and (3) requiring *directly or indirectly the use of the same skills employed by Employees* on the date the Participant's pension commenced (or would have commenced)[.]"[9]  AR 207 (emphasis added).  "Employee" is defined to include "an alumni employee employed by any Employer or local union signatory" to the Plan, and the definition of "Employer" includes IBEW Local 6.  AR 195.  Work for IBEW Local 6, therefore, constitutes "work of the type performed by Employees covered by the Plan."  It is reasonable to find that work for the IBEW Ninth District is the same "type" of work:  union work in support of electrical workers.  And, as noted above, the two positions involve some overlapping skills, such as knowledge of union organizing.  Because O'Rourke's IBEW Ninth District work seems to fall into prohibited employment after normal retirement age (assuming the hours and location requirements are met), it is reasonable for the Board to conclude his work falls within the much broader definition of prohibited employment before normal retirement age.

The Plan's use of "Electrical Trade" is ambiguous.  I cannot find that the Board's interpretation of "Electrical Trade" "clearly conflicts with the plain language."  *Tapley*, 728 F.3d at 1140.  Put in context with the narrower definition of prohibited employment after normal retirement age, the Board's construction of the Plan to include work for the IBEW Ninth District was reasonable.

---

[9] Defendants cite to the SPD for the language "work in employment of the type performed by Employees covered by the Plan."  But the SPD does not "constitute the *terms* of the plan."  *See CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (original emphasis).  Regardless, the language does appear in the Plan itself.

United States District Court
Northern District of California

**B.  The Interpretation Does Not Render Other Terms Nugatory**

Relying on *Tapley*, O'Rourke also asserts that the Board's interpretation improperly conflates "Electrical Industry" and "Electrical Trade," rendering "trade" nugatory.  Defendants argue that the Board's interpretation was reasonable because "the Plan links Electrical Industry with Electrical Trade and sets up an equivalence between those terms."  Defendants' MSJ at 16.

In *Tapley*, the relevant pension plan prohibited post-retirement employment that was: "(a) within the geographic area covered by the Plan . . .; (b) in a job classification in which the Participant was employed while in Covered Employment . . .; *and* (c) in the industry in which the Individual Employers participate (any business activity of the type engaged in by the Individual Employers maintaining the Plan)."  728 F.3d at 1136-37 (original emphasis removed; emphasis added).  The Trustees determined the plaintiffs' post-retirement jobs as a traffic flagger and snow plow operator constituted the same "job classification" as their former union jobs as skilled mechanics.  *Id.* at 1136, 1138.

The Ninth Circuit found the Trustees' interpretation was an abuse of discretion.  The court noted that the plan's plain language required an interpretation of "job classification" that is "less encompassing than 'industry' . . ., which refers to the broader types of business activities engaged in by the employers maintaining the [p]lan."  *Id.* at 1140.  Yet the Trustees broadly construed "the language ['job classification'] to preclude appellants from retiring to unskilled jobs," giving the Trustees "the power to preclude post-retirement within the construction industry."  *Id.* at 1141.  The court explained, "An interpretation that conflates the two terms conflicts with the plain language of the [p]lan by rendering the term 'job classification' nugatory."  *Id.* at 1140.

Here, unlike in *Tapley*, the terms "Electrical Industry" and "Electrical Trade" are not separate requirements for finding prohibited employment.  Rather, one term is used to define the other.  O'Rourke insists that the terms cannot be equivalent; his argument rests on the assumption that "Electrical Trade" must mean something narrower than "Electrical Industry."  O'Rourke Reply at 8.  But the term "trade" as used in the Plan is ambiguous and the Board elected to interpret it in the broadest sense.  The Board concluded in the Appeal Denial Letter "that 'Electrical Trade' . . . means any service in any capacity in the U.S. electrical industry."  AR 354.

18

Although this interpretation is circular and fails to resolve the ambiguity, it does not render any Plan term nugatory. It was not necessary to interpret "all branches of the Electrical Trade" as "less encompassing" or otherwise different than "Electrical Industry." *See Tapley*, 728 F.3d at 1140. I cannot find an abuse of discretion on that basis.

**C. The Interpretation Does Not Lack a Rational Nexus to the Plan's Purpose**

Next, O'Rourke argues that the Board's interpretation lacks a rational nexus to the Plan's primary purpose. *See Burditt v. W. Growers Pension Plan*, 636 F. Supp. 1491, 1497 (C.D. Cal. 1986), *aff'd*, 818 F.2d 698 (9th Cir. 1987) ("[T]here should be some rational nexus between the trustees' interpretation of the Pension Plan and the policy to be furthered thereby.").

The Appeal Denial Letter states that the reason for a broad interpretation of the prohibited employment rule "is partly to prevent retirees from simultaneously receiving pension benefits and working in a position that might displace a non-pensioner." AR 354. O'Rourke asserts that this is the primary purpose underlying the prohibited employment provision. O'Rourke's MSJ at 16 (citing *Hurn v. Ret. Fund Trust of Plumbing, Heating & Piping Indus. of S. Cal.*, 703 F.2d 386, 390 (9th Cir. 1983) ("The Fund has a clear interest in not paying benefits to early retirees employed in the industry; they already receive a full income, and the Fund does not want them to compete for jobs with younger workers ineligible for benefits.")). O'Rourke argues that denying his pension benefits does not serve this purpose because "[h]is employment in no way competes with or undercuts the wages and working conditions of active union electricians." O'Rourke's MSJ at 17. He does not, however, address whether his employment competes with Plan participants who worked as local union officials and wish to pursue employment with the union at the international level before they are eligible for retirement benefits.

Defendants assert that the Board's determination furthers a goal of ensuring that "benefits are provided to those who actually retire or intend to retire and that all participants are treated equitably." Defendants' MSJ at 22. Interpreting the Plan to avoid inequity is a legitimate goal for a Board to pursue. *Cf. Smith*, 654 F.2d at 655-56 (finding an interpretation of the suspension of benefits clause to withhold retirement benefits from an otherwise eligible member was a "reasonable way to ameliorate [an] inequality").

United States District Court
Northern District of California

United States District Court
Northern District of California

Despite O'Rourke's contention, this is not a post-hoc rationale.  In rebuttal to O'Rourke's argument that approving his claim would not be inconsistent with the Board's other decisions, the Appeal Denial Letter states, "Although we know of no previous Board determination regarding service for the International union, the service is nonetheless squarely within the Electrical Trade as the term has been defined.  Accordingly, finding service for the International union to be outside the Electrical Trade would require the Board to change its position that the phrase be applied broadly."  AR 357.  The Board meeting minutes also reflect a worry about inequity.  For example, at the March 18, 2014 meeting, Trustee Bamberger "expressed concern regarding the inconsistent or new interpretation of the meaning of prohibited employment would result in unfairness or inequity if individuals are allowed to draw a pension while working for the International given the types of employment for which exemption requests have been denied[.]"  AR 120.  "He was also concerned that those previously denied individuals could and would very likely bring claims against the Plan if the Trustees were to change course now."  *Id.*

Moreover, the Board has relied on concerns over fairness and equity to amend the Plan in the past, including eliminating case-by-case waivers.  AR 18.  And, although not articulated by the Board, another apparent inequity that could result from granting O'Rourke's application for benefits is that pensioners' early retirement benefits would be suspended if they took a post-retirement position with IBEW Local 6 because it is covered employment, but not if they worked for the international union, even though both positions involve some level of organizing work.  AR 202.

In sum, I cannot conclude that the Board's decision lacks any rational nexus to the Plan's purpose.

**D.  The Board's Decision was Not Otherwise Unreasonable**

O'Rourke offers two additional reasons that the Board's decision was an abuse of discretion.  First, he asserts that the Board abused its discretion by not giving effect to his adopted proposal from the September 2010 meeting.  Second, he contends that the Board's decision was made in bad faith.

### 1.  September 2010 Board Meeting

O'Rourke argues that the Board should have given effect to what he characterizes as a "resolution" from the September 2010 Board meeting.  At that meeting, O'Rourke "proposed consideration of a change to the suspension benefits rules that would provide an exemption from prohibited employment for work performed for Local or National AFL-CIO affiliates such as the IBEW, Labor Council, State Associations, and Building Trades Council, as well as the ability to enter into alumni subscription agreements that would allow non-retired Participants who work for those entities to continue participating in the [Trust]."  AR 82. He recommended that the Board approve the proposal at that meeting "with review of the Plan and Trust documents by Co-Counsel to determine what changes, if any, are required to accomplish this."  AR 82.  O'Rourke's declaration provides, "My 2010 proposal was unanimously accepted.  As the Chair of the Board of Trustees, I did not make a motion or vote on the motion."  AR 359.  And the "Plan Administrator and Trust counsel stated at the meeting in 2010 that they did not believe an amendment would be required."  AR 359.

The Appeal Denial Letter states that the Board "did not treat this adopted motion as an amendment.  It did not contain an effective date, was not clear as to its scope (for example, would it cover all AFL-CIO affiliates?), and wasn't clear as to whether the action itself was an amendment)."  AR 356.  Instead, the letter notes that that the action taken at the meeting "is best understood as a directive to the Plan's counsel to prepare an amendment giving effect to the substance of the recommendation that was approved 'in concept.'"  AR 356.  Because no amendment was ever adopted, the letter reasons, "the approval of the recommendation had no effect on the Plan's terms" and is not an applicable basis for granting O'Rourke's application for benefits.  AR 356.

I agree with defendants.  The September 2010 meeting did not result in a formal amendment to the Plan that the Board was thereafter required to follow.  At the April 2012 meeting, Plan counsel provided the Board with a draft amendment, but it was never adopted.  AR 102, 104.  Although "the Trustees approved the concept of a change to the suspension of benefits rules," the meeting minutes reflect why the Board believed it needed a formal amendment:

> At that time [September 2010], the Trust was waiting for comments from the IRS on the restated plan that was submitted in proposed form and not yet formally approved by the Trustees. This change would have been incorporated into the document along with any other changes determined by the IRS prior to its adoption. However, the Plan document was unexpectedly approved as submitted and, as a result, will now require an amendment to accomplish the action that was taken in September 2010.

AR 102. This explanation, plus the lack of clarity noted in the Appeal Denial Letter, reasonably demonstrates that the Board was not bound by the concept it approved at the September 2010 meeting. Although the March 2014 Memo later noted that an amendment was not required, the Board ultimately decided against that advice. Because no further action was taken to amend the Plan, the Board did not abuse its discretion by not exempting work for the IBEW Ninth District from the prohibited employment rule.

**2. Bad Faith**

O'Rourke also argues that the Board's decision "was motivated by irrational bias" against him, as evidenced by statements made by Trustee Doherty, the Appeal Denial Letter, and the Board's purported failure to consider O'Rourke's job duties when making its decision. O'Rourke's MSJ at 18-19. None of O'Rourke's cited examples are sufficient to establish bias or bad faith.

Trustee Doherty wrote in an email, "Time and time again, Plan participants sought to have their benefits paid while working in an administrative capacity. Mr. O'Rourke should know that better than anyone since it was he that championed that determination." AR 154. Doherty also wrote, "John [O'Rourke] has a far better argument at age 65 than he does today . . . but it is still . . . a loser barring an amendment to the plan." AR 229. O'Rourke argues that these statements "reveal a willingness to disregard the Plan terms in order to reach an adverse result for Mr. O'Rourke." O'Rourke's MSJ at 18. To the contrary, these statements assert that the Board has previously interpreted "prohibited employment" broadly to include administrative positions during the time O'Rourke served on the Board. They are insufficient to demonstrate any personal bias against O'Rourke.

O'Rourke next points to the Appeal Denial Letter, which in one section states that the Board "declines to interpret the fundamental term 'Electrical Trade' expansively" and in another

1   states, "finding service for the International union to be outside the Electrical Trade would require

2   the Board to change its position that the phrase be applied broadly." AR 357. O'Rourke contends

3   that these inconsistent statements demonstrate that the Board's "decision serves interests other

4   than those of fair, accurate, and objective application of the Plan terms." O'Rourke's MSJ at 19.

5        However, the inconsistency seemingly stems from imperfect drafting, rather than bias.

6   The "expansively" language appears in a section responding to O'Rourke's note that Plan counsel

7   identified "wiggle room" in how the Board has interpreted what fits into an exception to the

8   prohibited employment rule. AR 336, 357. The letter states,

9            The relative flexibility of determining what fits with the JATC
             instruction exception was based on the Board's desire to interpret
10           the express exceptions somewhat more broadly. Services performed
             for the IBEW are not covered by an exception, and the Board
11           declines to interpret the fundamental term 'Electrical Trade'
             expansively for reasons previously discussed.

12   AR 357. Defendants argue that this section "explained that the Board declined to apply the same

13   flexibility used in expanding the JATC instructor exemption to allow Plaintiff to continue to work

14   in the Electrical Industry while receiving early retirement benefits." Defendants' Reply at 5 n.4.

15   Also, the preceding portion of the letter details how the Board has chosen to apply the prohibited

16   employment provision "broadly" and declined to interpret it narrowly. AR 354-356. And the

17   purportedly inconsistent statement in the paragraph following the JATC discussion reaffirms that

18   the Board interprets "Electrical Trade" broadly. AR 357.

19       Finally, O'Rourke contends that the Board did not review his job duties. But the Appeal

20   Denial Letter states, "The Board generally accepts the Claimant's Declaration that accompanied

21   the July 10 appeal." AR 354. The declaration attached to O'Rourke's July 10, 2015 appeal

22   included a description of his job duties. AR 359. Also, at the December 9, 2014 meeting, the

23   Board reviewed O'Rourke's letter containing his job description submitted in response to the

24   Board's request. AR 141. Therefore, the record demonstrates that the Board reviewed both

25   documents containing O'Rourke's IBEW Ninth District job duties.

26       In short, the administrative record does not reflect any bad faith in the Board's decision-

27   making.

28

United States District Court
Northern District of California

**CONCLUSION**

Overall, the Board's interpretation does not conflict with the Plan's plain language, render any term nugatory, or lack a rational connection to the Plan's purpose.  Nor has O'Rourke shown that the Board acted with bias, bad faith, or improper personal motivation.  The Board could certainly create an exception from the prohibited employment rule for work at the IBEW Ninth District.  Indeed, the record indicates that other plans have allowed former business managers to collect local pensions while working for the international union.  AR 112.  However, the Board was not required to interpret the Plan in that way and its decision was not an abuse of discretion.  This is not to imply that I would have interpreted the Plan in the same way as the Board.  But I cannot say the Board's decision is "not grounded on *any* reasonable basis."  *Tapley*, 728 F.3d at 1139 (original emphasis).  O'Rourke's motion for summary judgment on Claim One is DENIED and the defendants' cross-motion is GRANTED.

A further case management conference is set for **January 24, 2017, at 2:00 p.m.**  The parties shall file a Joint Case Management Statement on January 17, 2017.

**IT IS SO ORDERED**.

Dated: December 29, 2016



WILLIAM H. ORRICK
United States District Judge