UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN J. O'ROURKE,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN CALIFORNIA ELECTRICAL WORKERS PENSION PLAN, et al.,<br><br>Defendants. | Case No. 3:16-cv-02007-WHO<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 62, 65 |

## INTRODUCTION

This lawsuit concerns plaintiff John J. O'Rourke's claim for early retirement benefits. He currently works as the Ninth District Vice President of the International Brotherhood of Electrical Workers ("IBEW"), but previously worked as an electrician for approximately 20 years and then Business Manager in IBEW Local 6, during which time he served as a labor trustee on the Board and acted as chair for several years. He left his position with Local 6 in March 2012 to accept a representative position in the IBEW.

At the time he left Local 6, the Board had not finalized a 2010 action in which it agreed to consider a change to the suspension of benefits rule that would provide an exemption from prohibited employment for work performed for Local or National AFL-CIO affiliates, including the IBEW. In 2014, the Board denied O'Rourke's application for early retirement benefits under the Northern California Electrical Workers Pension Plan because it interpreted "prohibited employment" to include his work with the IBEW.

Prior to fact discovery, I considered the parties' cross-motions for summary judgment on O'Rourke's first claim for benefits pursuant to the Plan under ERISA section 502(a)(1)(B). I granted defendants' motion; although both parties presented plausible interpretations of the

ambiguous Plan, O'Rourke failed to demonstrate that the Board had abused its discretion in interpreting the prohibited employment provision to include his IBEW work.

Fact discovery has now closed, and O'Rourke raises a motion to reconsider my prior order based on new evidence, clear error, and extraordinary circumstances. In the alternative, he argues that he is entitled to summary judgment on his second claim, that the Board breached its fiduciary duty pursuant to ERISA section 502(a)(3) when it failed to follow through on the 2010 action approving the concept that IBEW work is not prohibited employment. Defendants filed a cross motion for summary judgment on this claim, arguing that it fails as a matter of law because the act of amending a plan is a settlor function, not a fiduciary duty. To the extent he can state a claim for breach of fiduciary duty for failure to keep him informed, it insists that the evidence demonstrates he was fully informed. It also contends that he cannot satisfy the requirements for his requested forms of equitable relief, estoppel and reformation.

Because O'Rourke fails to present any material new evidence, establish clear error, or demonstrate extraordinary circumstances justifying his motion for reconsideration, it is DENIED. O'Rourke's second claim fails on several grounds. Assuming that he can state a claim, the undisputed evidence indicates that he was fully informed on the status of the Board's failure to finalize the 2010 action. Even if I accepted his contention that the Board failed to provide reliable information, he cannot establish the requisite elements for his requested relief. Defendants' motion for summary judgment is GRANTED.

## BACKGROUND[1]

### I.    FACTUAL BACKGROUND

#### A.    The Pension Plan

Defendant Northern California Electrical Workers Pension Plan (the "Plan") is a multiemployer defined benefit pension plan. Complaint ("Compl.") (Dkt. No. 1) ¶ 5; Answer ("Ans.") (Dkt. No. 15) ¶ 5; Administrative Record ("AR") 204.[2] The parties agree that the Plan is

---

[1] A significant portion of the background is copied from the prior order on the parties' cross motions for summary judgment. Additional facts are inserted when necessary.

[2] The Administrative Record is comprised of certain exhibits containing the Bates number prefix

covered by the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan provides for three types of benefits: (1) normal pension; (2) early pension; and (3) disability pension. AR 197. Pension benefits are paid from the Northern California Electrical Workers Pension Trust to which employers under the Plan contribute. AR 373.

Defendant Board of Trustees of the Northern California Electrical Workers Pension Trust (the "Board") has an equal number of Management Trustees and Labor Trustees appointed respectively by the San Francisco Electrical Contractors Association, Inc., and Local 6 of the International Brotherhood of Electrical Workers ("Local 6"). AR 374, 378, 382. The Plan vests the Board with "the exclusive power and discretion to interpret the provisions of the Plan and any rules issued under the Plan, and to determine all questions arising under the Plan including eligibility for benefits." AR 218. The "Plan's provisions are designed and intended to comply with the Code and ERISA, as amended, and the construction and interpretation of the Plan shall be consistent with the Code, ERISA, and the Trust Agreement."[3] AR 218. The Board "may amend or modify [the] Plan, provided that no amendment or modification may reduce any accrued benefit except as permitted or required by ERISA and the Code, including regulations thereunder." AR 218.

The Plan provides for suspension of early retirement benefits when a retiree works in "prohibited employment." AR 206. It defines "prohibited employment" before normal retirement age as "the performance of services in any capacity in the Electrical Industry."[4] AR 207.

---

"NCEW PP-O'Rourke" and attached as exhibit H to the Declaration of Clarissa Kang (Dkt. No. 63).

[3] The Plan defines the "Code" as the Internal Revenue Code of 1986, and "ERISA" as the statute "as applied by regulations issued thereunder." AR 195. The "Trust Agreement" refers to the Northern California Electrical Workers Pension Trust. *See* AR 370.

[4] The Plan provides a narrower definition of prohibited employment *after* normal retirement age: "'Prohibited Employment' . . . means the performance of services of 40 hours or more during the month: (1) in the ten San Francisco Bay Area counties . . .; (2) in work the type performed by Employees covered by the Plan on date the Participant's pension commenced . . . ; and (3) requiring directly or indirectly the use of the same skills employed by Employees on the date the Participant's pension commenced . . . , including any supervision of employees in the same trade or craft or directly or indirectly using the same skills as Employees covered by the Plan on the date the Participant's pension commenced[.]" AR 207.

"Electrical Industry" is defined as "all branches of the Electrical Trade in the United States."  AR
195.  The Plan does not define "Electrical Trade."

The Plan contains four exceptions to the Prohibited Employment rule, including:

> work (i) as a private or public building or electrical inspector, (ii) as
> an instructor in a Taft-Hartley Trust apprentice and training
> program, (iii) in sales of electrical equipment or products or (iv) in
> the manufacturing or marketing of electrical or electronic products
> and systems which does not substitute for on-site fabrication
> protected or sought to be protected under a Collective Bargaining
> Agreement.

AR 207.

Although not a part of the Plan, the summary plan description ("SPD")[5] notes, "Prohibited
Employment is interpreted in the broadest manner."  AR 297.  It further states:

> Prohibited Employment includes, but is not limited to, (1) work in
> employment of the type performed by Employees covered by the
> Plan whether or not under a Collective Bargaining Agreement, also
> known as Covered Employment; (2) work which requires directly or
> indirectly the use of the same skills used by Employees covered by
> the Plan on the date of the pension became effective [sic]; (3) work
> in employment for compensation or wages of any kind or for profit
> in the Electrical Industry; (4) work for profit as an owner or partner
> in any business directly or indirectly connected with the Electrical
> Industry; and (5) work where you supervise Employees in the same
> trade or craft or directly or indirectly use the same skills as
> Employees covered by the Plan on the date you retire.  It also
> includes any employment with a contributing Employer or any
> employment under any Collective Bargaining Agreement to which
> the Union is party, or any employment with the Union.[6]

> The term Electrical Industry means all branches of the Electrical
> Industry.   This includes working as a supervisor, estimator,
> salesman, consultant, or self-employed in any branch of the
> Electrical Industry, or any other work involving any electrical
> knowledge you have acquired as a Participant.

AR 297.

---

[5] The SPD states that if there is "any ambiguity or conflict between [the SPD] and the Plan, the
Plan will govern."  AR 235.

[6] "Union" is defined elsewhere in the SPD and in the Plan as "Local 6 of the International
Brotherhood of Electrical Workers" and also referred to as "IBEW Local 6."  AR 196.

4

United States District Court
Northern District of California

Participants may obtain an advanced determination of whether their post-retirement employment would be Prohibited Employment. AR 208; O'Rourke Dep. at 116:12–18 (Kang Decl., Ex. A; Dkt. No. 63-1).

**B.      O'Rourke's Covered Employment**

O'Rourke worked as an electrician for approximately 20 years and then worked for Local 6 as a "Business Manager/Financial Secretary" from July 1999 to March 2012. Ans. ¶ 8; O'Rourke Dep. at 26:9–10; 44:14–21, 51:5–6. Local 6 has approximately 2600 members. Doherty Dep. at 28:16–18 (Renaker Decl., Ex. C; Dkt. No. 70-3). The Local 6 business manager organizes the jurisdiction and supervises a staff that currently consists of eight business representatives, a full-time organizer, and five clerical workers. *Id*. at 16:21–19:25, 23:22–24.

While working for Local 6, O'Rourke served as a Labor Trustee on the Board and acted as Chair for several years. *Id.* ¶ 8. Both positions—electrician and local union official—were covered employment and established O'Rourke's 30 years of service to qualify him for an early retirement pension under the Plan when he turned 55 years old.

**C.      Plan Amendments While O'Rourke was on the Board**

During O'Rourke's time on the Board, two amendments to the Plan's prohibited employment provisions were adopted. AR 18, 53. In 2002, the Board adopted an amendment to eliminate case-by-case waivers to the suspension of benefits rules for direct management positions, such as project management, estimator, and human resources positions. AR 18; *see also* O'Rourke Dep. at 58:23–59:21, 62:22–64:5, 168:2–170:15. The Board adopted this amendment because it "recogniz[ed] that the . . . suspension rules which provided for waivers for direct management positions created an inequity by allowing 'alumni' employees the opportunity to draw pension benefits and retiree health coverage when bargaining unit employees are prohibited from doing so."[7] AR 18, 34; O'Rourke Dep. at 40:23–41:3, 59:22–60:1, 169:15–170:15. In 2006,

---

[7] The Plan defines "alumni employee" as "an individual employed in a nonbargaining unit position with an Employer who was previously employed for an Employer under a Collective Bargaining Agreement; provided, however, that such term shall not include any proprietor or partner of an unincorporated employer." AR 195.

the Board amended the prohibited employment provision to include the four enumerated exceptions.  AR 50, 53.

### D.    September 2010 Board Meeting

At the September 23, 2010 Board meeting, O'Rourke "proposed consideration of a change to the suspension benefits rules that would provide an exemption from prohibited employment for work performed for Local or National AFL-CIO affiliates such as the IBEW, Labor Council, State Associations, and Building Trades Council, as well as the ability to enter into alumni subscription agreements that would allow non-retired Participants who work for those entities to continue participating in the [Trust]."  AR 82.  O'Rourke recommended that the Board approve the proposal at that meeting "with review of the Plan and Trust documents by Co-Counsel to determine what changes, if any, are required to accomplish this."  AR 82; *see also* Paganini Dep. at 53:11–16 (Kang Decl., Ex. C; Dkt. No. 63-3).  The meeting minutes state, "M/S/C to concur with the recommendation."  AR 82.

O'Rourke's declaration, submitted to the Board at a later date, states, "My 2010 proposal was unanimously accepted.  As the Chair of the Board of Trustees, I did not make a motion or vote on the motion."  AR 359; *see* 2015 O'Rourke Decl. ¶ 7 (Kang Decl., Ex. I; Dkt. No. 63-10). Additionally, the "Plan Administrator and Trust counsel stated at the meeting in 2010 that they did not believe an amendment would be required."  AR 359.  A trustee alternate who attended the meeting, however, testified that he believed an amendment would have been necessary because O'Rourke's proposal did not fall within one of the four enumerated exceptions.  Bamberger Dep. at 51:21–52:12 (Kang Decl., Ex. D; Dkt. No. 63-4).

### E.    O'Rourke Leaves Local 6 to Work for the IBEW

A representative from the IBEW first approached O'Rourke about accepting a position with the IBEW in September 2001.  O'Rourke Dep. at 76:19–77:8.  He was approached several more times over the years before he finally indicated an interest in 2011.  *Id*. at 77:9–83:22.  Prior to accepting, he "want[ed] to check on [his] pension … to preserve and protect that."  *Id*. at 83:16–18.

In August or September 2011, he spoke with Judith Fisher, the Plan's administrator. *Id.* at 83:24–84:6. According to O'Rourke, he consulted Fisher because he would not leave Local 6 unless he knew he had his pension "locked down." *Id.* at 84:15–19. He testified that she "r[a]n some numbers" and advised him not to leave until he turned 52 and a half, and he would be eligible for his pension at 55. *Id.* at 85:7–12. He does not recall explicitly asking her if he would be eligible for his early retirement pension if he accepted the position at IBEW because it was "kind of a given." *Id.* at 90:17–91:12. According to Fisher, they did discuss his eligibility in the context of his potential employment with IBEW and she told him she "thought that [the exemption] would be approved eventually, an amendment." Fisher Dep. at 30:4–17; *see also id.* at 33:24–34:4 (Kang Decl., Ex. B; Dkt. No. 63-2).

In February 2012, O'Rourke gave notice that he intended to leave his position with Local 6 to work as a representative for the International Brotherhood of Electrical Workers, Ninth District ("IBEW Ninth District"). Ans. ¶ 9; AR 98. At that time, Fisher emailed Plan counsel, noting that no action had been taken following the September 2010 meeting and requesting counsel prepare something for the next Board meeting. AR 98. At the time he gave notice, O'Rourke knew that the Plan had not been amended, but he did not think an amendment was necessary. O'Rourke Dep. at 73:19–74:14. In March 2012, O'Rourke left his position with IBEW Local 6. AR 361.

In April 2012, Plan counsel provided a draft Plan amendment, adding an exception to prohibited employment for work "as an employee of the IBEW International Union." AR 102, 104. The management trustees noted that the proposed amendment did not accurately reflect the September 2010 proposal because it did not extend to management-side organizations, such as the electrical contractors' association. Coleman Dep. at 94:22–95:21 (Renaker Decl., Ex. B; Dkt. No. 70-2). The meeting minutes state that at the September 2010 meeting, "the Trustees approved the concept of a change to the suspension of benefits rules that would provide an exemption from prohibited employment for work performed for Local or National AFL-CIO affiliates, such as the IBEW," and "Co-Counsel was asked to determine what changes, if any, are required to accomplish this." AR 102. According to one trustee, any time the subject of prohibited employment came up, the conversation "became very heated." Donovan Dep. at 56:15–57:3

United States District Court
Northern District of California

(Renaker Decl. ISO Opp'n, Ex. A; Dkt. No. 77-1). The trustees repeatedly tabled the amendment.[8] *Id*. at 57:5–12; *see also* Doherty Dep. at 118:6–10 (Kang Decl., Ex. F; Dkt. No. 63-6); Coleman Dep. at 94:6–9 (Kang Decl., Ex. G; Dkt. No. 63-7).

The Board did not discuss the amendment again until the November 2013 meeting, when Trustee John Doherty requested that the matter be placed on the agenda for the March 2014 meeting. AR 101-102, 108-111. At the March 19, 2014 meeting, the Board discussed a memo drafted by Plan counsel six days earlier addressing "whether a plan participant's employment performing administrative or organizing work for a labor union (such as the IBEW International Office) or an employers association (such as NECA) constitutes 'Prohibited Employment' and is therefore grounds for suspension of early retirement benefits under [the Plan] as currently written." AR 115. The March 2014 Memo concluded that such work was not prohibited employment, explaining:

> Reference to the exceptions listed in the Plan Document, the discussion of "Prohibited Employment" in the [SPD], and relevant ERISA case law and regulations all indicate that term 'Electrical Trade' is properly interpreted as limited to performing services involving the technical skills and knowledge of an electrician. Administrative or organizing work for a labor union or employers' association cannot be said to be performance of 'Electrical Trade' services. Because the Plan's current definition of 'Prohibited Employment' does not prohibit such work, no amendment to the plan is necessary to clarify that such work is permitted.

AR 115.

Two Labor Trustees "expressed strong disagreement with the legal opinion." *Id.* Trustee Doherty stated, "because Local 6 participates as a covered employer in the Plan under a subscription agreement, that type of employment for Local 6, or any other IBEW for that matter, is considered 'covered employment' and is, therefore subject to suspension of benefits." *Id.* He considered allowing a participant to receive a local pension while working for the International union as "double dipping." *Id.*

Trustee Matthew Bamberger pointed out that the Plan "defines 'prohibited employment' in the broadest sense" and that "in early 2000, the Plan was amended to allow administrative and

---

[8] Defendants assert that the Board "declined to adopt [the] proposed Plan amendment[.]" Defs.' MSJ at 7:13–14. But, as O'Rourke points out, the issue was simply tabled and never voted on.

8

case-by-case exemptions from prohibited employment, but that these exemptions were later eliminated because of the unfairness of allowing some participants to continue working while drawing their pensions, when others were prohibited from doing so." AR 120. He was concerned that "the inconsistent or new interpretation . . . would result in unfairness or inequity if individuals are allowed to draw a pension while working for the International given the types of employment for which exemption requests have been denied since that time." *Id.* The Board requested counsel to research the matter further and look into the Plan's past practices in dealing with suspension of benefits. *Id.*

Plan Counsel prepared a second memorandum on August 13, 2014. AR 121-125.

### F. O'Rourke Applies for Early Pension Benefits and is Denied

In June 2014, O'Rourke submitted an application for unreduced early retirement pension benefits to begin in September 2014. AR 361-62. Neither party disputes that O'Rourke met the criteria: 55 years old and 30 years of service. Worried about a potential problem with O'Rourke's employment with the IBEW Ninth District, Fisher brought O'Rourke's application to the Board. Fisher Dep. at 112:2–13.

At the August 14, 2014 meeting, the Board reviewed Plan Counsel's August memo. AR 121-127. Counsel concluded:

> In view of these decisions and history of Board discussions, we agree that at times the Board has interpreted the definition of Prohibited Employment more broadly to include work that may not specifically bear upon or utilize skills and experience obtained by work in the electrical trade. For that reason, we do not believe that the Board should categorically exempt any work unless it satisfies one of the existing four exceptions in the Plan. Rather, as has been the practice in all other cases, we think the best course is for the Board to base its determination on careful consideration of all the facts and circumstances that may be submitted regarding the nature of the work in question.

*Id.* After considering the memo, the Board authorized Fisher to request from O'Rourke a written job description and a statement explaining why he believed his work at IBEW was not prohibited under the Plan. AR 127.

Around November 2014, O'Rourke became the Vice President of the IBEW Ninth District, overseeing the entire Ninth District. Ans. ¶ 9; AR 359. In response to the Board's request,

9

O'Rourke submitted a letter noting that he served as Vice President of the IBEW Ninth District, which is comprised of six states, 65 local unions, and 129,000 members.[9] AR 348. O'Rourke also stated, "My duties are purely administrative and do not require, directly or indirectly, the use of the same skills employed by electricians in an electrical trade or craft. Furthermore, my responsibilities do not include supervising employees in said trade or craft. My employment . . . does not require the technical skills of an electrician." AR 348. In December 2014, the Board considered O'Rourke's letter, but did not reach a decision. AR 349; *see* 12/14 Fisher letter (Kang Decl. ¶ 18, Ex. P; Dkt. No. 63-17).

In January 2015, O'Rourke's attorney wrote to the Plan demanding it pay O'Rourke's pension benefits. AR 149-51.

In March 2015, the Board met and decided to deny O'Rourke's application "because the work he is performing does not meet one of the exceptions to the suspension of benefits provisions of the Plan." AR 168. On March 27, 2015, Plan counsel sent O'Rourke a letter detailing reasons for finding that his employment constituted "prohibited employment." AR 350-52 ("Application Denial Letter"). The Application Denial Letter noted that the Plan provides only four limited exceptions to the prohibited employment rule and that the action taken in September 2010 was insufficient to implement the proposed exception because no amendment had been adopted. AR 350-51. The letter further explained:

> The Plan . . . does not limit application of the suspension rule to early retirees who continue to use technical electrician skills in their post-retirement work. Rather, it requires suspension of benefits whenever an early retiree, not falling within any of the four enumerated exceptions, is performing services in any capacity in the Electrical Industry. Applying this broad language, the Board has determined that work as a marketing representative or a project manager, or in other positions which likewise do not entail the use of the technical skills of an electrician, nevertheless constitutes the performance of services in the Electrical Industry, and

---

[9] In the Prior Order, I found that "[t]he administrative record contains sufficient information regarding O'Rourke's position with the IBEW Ninth District[,]" and denied defendants' Request for Judicial Notice of a printout of the homepage of the IBEW Ninth District. I nonetheless consider additional evidence regarding the nature of O'Rourke's IBEW employment in deciding the current cross-motions, including the fact that only 32 of the 64 IBEW Ninth District local unions are electrical construction locals like Local 6. O'Rourke Dep. at 193:4–12 (Renaker Decl., Ex. G; Dkt. No. 71-1). O'Rourke testified that he "represent[s] people who work in a variety of capacities that are not specifically related in any way, shape, or form to the electrical industry," including "people who work in assembly of medical goods" and "teachers." *Id*. at 193:13–21.

is thus prohibited employment. That some of those positions may require an electrician's background cannot be taken to mean that the performance of services in the Electrical Industry is constrained to those positions that require the skills of an electrician. The position Mr. O'Rourke holds, Vice President of the IBEW Ninth District, plainly contemplates the performance of services of some capacity in the Electrical Industry.

AR 351.

The letter also rejected O'Rourke's argument that "work for the International does not constitute work in the 'Electrical Industry' at all, as it is not work in which 'employers maintaining the Plan are engaged." *Id.* Instead, the letter found that is not the way "industry" is commonly used, noting the IBEW and National Electrical Contractors Association

have acted as industry partners for over a century, not only in the administration of their collective bargaining agreements, but also in electrical construction and marketing, in training and certification of electricians, in efforts to change the laws and regulations governing electrical contracting, and much more.

*Id.* Lastly, the letter stated that ERISA regulations regarding suspension of benefits after normal retirement age (65 years old) were inapplicable to suspension of early retirement benefits. *Id.*

### G. O'Rourke Appeals and is Denied Again

On July 10, 2015, O'Rourke appealed the denial of his claim for benefits. AR 332-37. In support of his appeal, O'Rourke submitted a declaration describing his job duties as the Vice President of the IBEW Ninth District, stating:

My job is to promote the IBEW's mission of organizing workers into local unions, securing reasonable terms of employment including adequate pay and work hours, cultivating feelings of friendship among workers, and elevating the moral, intellectual and social conditions of members and their families. It is an administrative position.

I do not perform electrical work, supervise or oversee electrical work, teach electricians, work with electrical contractors, draft electrical specifications, or sell, construct, rent or repair electrical components in my current position.

My position with the IBEW does not require any manual or mechanical skill.

AR 359.

11

The Board met on August 11, 2015, and discussed O'Rourke's appeal letter and upheld the denial of O'Rourke's application for early retirement benefits. 8/11/15 Meeting Minutes (Kang Decl ¶ 20, Ex. R; Dkt. No. 63-19).

On September 11, 2015, Plan counsel sent a letter to O'Rourke's attorney detailing the reasons for denying his appeal. AR 354 ("Appeal Denial Letter"). Noting that "Electrical Trade" could be interpreted in multiple ways, counsel stated, "This Board has chosen to apply the term broadly, such that 'Electrical Trade' . . . means any service in any capacity in the U.S. electrical industry." AR 354. The letter further explained, "The reason for this interpretation is partly to prevent retirees from simultaneously receiving pension benefits and working in a position that might displace a non-pensioner, but also avoid providing an incentive for experienced electricians to leave fieldwork for an administrative position in the industry and the substantial benefit costs that would go with it." AR 354-55.

The Appeal Denial Letter also states that the reason for the four exceptions to the prohibited employment rule "is based on a recognition that it is in the electrical industry's general interest to allow an early retiree to perform certain ancillary functions for which it might otherwise be difficult to find qualified individuals." AR 355.

Next, the letter asserts that its interpretation of "trade" is in line with the plain meaning of the word. AR 355. For example, two ways that Webster's New World Dictionary (Third College Edition) defines "trade" is "a means of earning one's living, occupation, work, or line of business" and "all the persons or companies in a particular line of business of work." AR 355. Under this meaning, the Board found:

> IBEW Service is service within the Electrical Trade because Mr. O'Rourke would be working for a union whose function is to provide direct representation and support for workers within the electrical trade. It does not matter whether IBEW Service is administrative or actively working as an electrician; the "industry" and the "trade" refers to both types of services. Therefore, unless an exception applies, IBEW Service would constitute Prohibited Employment.

AR 355. The letter notes that O'Rourke's current employment does not fit within any of the four exceptions. AR 355-56.

Additionally, the letter addresses O'Rourke's September 2010 proposal. "The Board . . . did not treat this adopted motion as an amendment. It did not contain an effective date, was not clear as to its scope (for example, would it cover all AFL-CIO affiliates?), and wasn't clear as to whether the action itself was an amendment." AR 356. Instead, the Board determined at its March 2015 meeting that the recommendation required an amendment. AR 356. Therefore, "the motion that carried in September 2010 was an agreement by the labor and management trustees, in concept, to adopt an amendment in the future, generally consistent with the recommendation." AR 356. However, no amendment was ever adopted.

### H. Additional Evidence

In support of his motion for reconsideration, O'Rourke submitted declarations from current and former IBEW representatives who have received pension benefits from their local union plans while working for the IBEW. *See* Chilia Decl. ¶ 5; Mowry Decl. ¶¶ 3–4; Tilmont Decl. ¶ 5; Uno Decl. ¶¶ 4–5 (Dkt. Nos. 66, 67,68, 69). These individuals followed the same career path from local union business manager to International official. Chilia Decl. ¶¶ 2–4; Mowry Decl. ¶ 2; Tilmont Decl. ¶¶ 2–4; Uno Decl. ¶¶ 2–3. Many of them attested that drawing a local pension while serving as an International representative is common practice and necessary to account for the salary differential experienced by many business managers of metropolitan local unions who leave to join the International union. Mowrey Decl. ¶ 5; Tilmont Decl. ¶¶ 6–9.

## II. PROCEDURAL BACKGROUND

On April 15, 2016, O'Rourke filed his complaint asserting two claims under the Employee Retirement Income Security Act of 1974 ("ERISA"). Complaint (Dkt. No. 1). The first claim is for benefits pursuant to the Plan under ERISA section 502(a)(1)(B). The second claim is for breach of fiduciary duty under ERISA section 502(a)(3). On June 14, 2016, defendants filed their answer. (Dkt. No. 15). The parties then filed cross-motions for partial summary judgment on Claim One. O'Rourke's Motion for Summary Judgment (Dkt. No. 26); Defendants' Opposition and Cross-Motion for Summary Judgment (Dkt. No. 29). On December 29, 2016, I granted defendants' motion for summary judgment on O'Rourke's first claim because the Board did not

abuse its discretion interpreting the prohibited employment provision.  Order Re Cross Mots. for Partial Summ. J. ("Prior Order")(Dkt. No. 40).

The parties proceeded through discovery, and then filed cross-motions for summary judgment on Claim Two, breach of fiduciary duty.  Defs.' Mot. for Summ. J. (Dkt. No. 62)("Defs.' MSJ"); Pl.'s Mot. for Summ. J., Reconsideration (Dkt. No. 65).  In his prayer for relief, O'Rourke seeks a declaration that (1) defendants are estopped from denying his early pension benefit and (2) the Plan is reformed to exempt IBEW work from prohibited employment.  Compl. at 7:17–21.

## LEGAL STANDARD

## I.    RECONSIDERATION OF ERISA CLAIM ONE – DENIAL OF BENEFITS

A party seeking reconsideration in the Northern District of California must first seek leave of Court.  Civil L. R. 7-9(a).  The moving party must show reasonable diligence and one of the following:

> (1) that at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the court before entry of the interlocutory order for which the reconsideration is sought, and that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or (2) the emergence of new material facts or a change of law occurring after the time of such order; or (3) a manifest failure by the court to consider material facts which were presented to the court before such interlocutory order.

Civil L. R. 7-9(b).

## II.   SUMMARY JUDGMENT OF ERISA CLAIM TWO – BREACH OF FIDUCIARY DUTY

"Sections 404 and 409 of ERISA impose respectively a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996); *see* 29 U.S.C. §§ 1104(a), 1109(a).

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-

moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

O'Rourke spends the majority of his motion urging me to reconsider the Prior Order granting defendants' motion for summary judgment on his claim for benefits. He then moves on to argue, in the alternative, that I should grant summary judgment in his favor as to his second claim for breach of fiduciary duty. This claim stems from his allegations that the Board failed to (1) inform him that it considered the Prohibited Employment rule to cover work for the IBEW; (2) determine whether the Plan required an explicit exemption for work with AFL-CIO affiliated entities; and (3) amend the Plan to add an exemption, to the extent it was not amended at the September 2010 meeting. Compl. ¶40.

Defendants argue that O'Rourke's second claim fails on several grounds. Defs.' MSJ at 10–11. First, the decision to amend a Plan is a settlor function, not a fiduciary act, so his claim fails as a matter of law. Second, he was well informed about the Board's consideration of whether IBEW work constituted Prohibited Work. Third, he cannot establish the elements of equitable estoppel or reformation. And fourth, his claim is time-barred because he failed to file his lawsuit within three years of his actual knowledge of defendants' alleged breach in April 2012.

# I.    RECONSIDERATION OF CLAIM ONE[10]

O'Rourke asks me to reconsider the Prior Order granting defendants' motion for summary judgment on his claim for benefits. Even if I ignore the fact that he failed to obtain leave to file the motion in accordance with the local rules, there is no basis for his motion.

## A.    No New Evidence

O'Rourke argues that new evidence clarifies the nature of his work, clearly demonstrating the differences between his work as IBEW Ninth District Vice President and work as a Business Manager for Local 6, and establishes that the Board abused its discretion by not considering this evidence when it denied his claim. Reply ISO Pl.'s MSJ at 4–5. He insists that "[t]his evidence is new in that it did not exist at the time of the Court's prior order." *Id*. at 5.[11] But this hardly constitutes "new material facts." Even if I considered the additional information to be "newly discovered evidence," it would not change the outcome.[12] The additional evidence demonstrates that his current work involves a higher level of management and includes organizing workers outside of the electrical industry, but it does not alter the conclusion that "the two positions involve some overlapping skills, such as knowledge of union organizing." Prior Order at 17. As defendants point out, the requirement that prohibited employment be in the Electrical Industry does not mean that it must be *exclusively in* the Electrical Industry. *See* AR 297 (summary plan

---

[10] Defendants argue that O'Rourke's motion is untimely because he could have filed it soon after the Prior Order issued in December 2016. Defs.' Opp'n to Pl.'s MSJ at 16. Because it was reasonable for O'Rourke to ask for reconsideration at the same time he sought summary judgment on his second claim, I will ignore the timeliness issue and address the merits of his arguments.

[11] Defendants argue that any "new" evidence would be "wholly outside of the administrative record and outside of the evidence that the Court could have considered in Plaintiff's First Motion." Defs.' Opp'n to Pl.'s MSJ at 11. O'Rourke insists that the "new" evidence "is properly considered in evaluating the Trustees' decision on abuse of discretion review because it documents information that was available to the Trustees during the claim-and-appeal process." Pl.'s Reply at 5. Regardless of the characterization, I agree with defendants that any "new" evidence is immaterial.

[12] Defendants point out that the question of overlapping skills and duties is only relevant to suspension of normal retirement age benefits and O'Rourke is appealing the Board's denial of early retirement benefits. I acknowledged this in the Prior Order, but nonetheless found the comparison helpful to determining if the Board's interpretation conflicts with the Plan's plain language. *See* Prior Order at 16–17.

description notes).[13]

More importantly, the "new" evidence does not alter the outcome here. I previously rejected O'Rourke's argument that the Board abused its discretion when it denied his application based on a stated goal to attain consistency with prior determinations on suspension of benefits. He reframes that argument in his current motion—that the Board abused its discretion by failing to consider surrounding circumstances when interpreting the ambiguous Plan, such as "the fact that other IBEW local union pension plans permit former business managers to draw early pensions while working for the International union." Pl.'s MSJ at 10. But the Board did consider this evidence. *E.g.*, Coleman Dep. at 33:8–20 (Renaker Decl., Ex. B; Dkt. No. 70-2). It simply elected to give it little weight relative to the Plan's language and the prior determinations on suspensions of benefits.[14] This does not amount to an abuse of discretion. *See* Prior Order at 24 (finding no abuse of discretion because the Board was not required to interpret the Plan in the same way other Boards have interpreted their plans).

## B. No Clear Error

O'Rourke asserts that the Prior Order contains two clear errors: (1) a misunderstanding of the purpose of the suspension of benefits provision, and (2) a misunderstanding of the Plan's accrual of benefits provision.

O'Rourke insists that I misinterpreted the narrow exception to ERISA's anti-forfeiture rule as "indicating a general rule that a plan can suspend benefits for work in any job that could theoretically be performed by a non-retired worker, unmoored from whether the work is a

---

[13] O'Rourke insists that "there are no significant overlapping duties and skills" between the two positions. Even if I accepted his representation I would not conclude that the Board abused its discretion in reaching a different conclusion. As I stated in the Prior Order, "both sides present plausible interpretations of the ambiguous Plan." Prior Order at 1.

[14] O'Rourke points out that the plans considered by the Board likewise did not contain an explicit exemption for IBEW employment, which further supports his point that the Board "ignored information that ... the prohibited employment rule was not intended to permit suspension of benefits in his circumstances." Reply ISO Pl.'s MSJ at 6. But this still does not demonstrate that the Board abused its discretion. As I previously held, the Board's interpretation did not (1) "clearly conflict[] with the plain language"; (2) "render[] nugatory other provisions of the Plan"; or (3) "lack[] any rational nexus to the primary purpose of the Plan." *See* Prior Order at 13–24 (quoting *Tapley*, 728 F.3d at 1140).

bargaining-unit job." Pl.'s MSJ at 13.   He contends that IBEW employment does not "compete with, [or] undercut the wages and working conditions of employees covered by the plan[,]" so it should not constitute Prohibited Employment when viewed in the context of the purpose of the suspension of benefits provision.  He emphasizes that "an IBEW International Vice President does not undermine IBEW members' wages and working conditions; he works to improve them."  *Id*. at 12.

According to O'Rourke, the purpose of the suspension of benefits provision is to protect *union* jobs, rather than "any job opportunity that a non-retired participant might wish to pursue. *Id*. at 13.  Because his positions with the IBEW could not be held by a bargaining unit member, he insists that they should not be considered Prohibited Employment.  Defendants once again point out that the suspensions of benefits under ERISA section 203 are inapplicable to early retirement benefits.  They also underscore that O'Rourke previously raised the same argument that his IBEW employment does not compete with bargaining unit jobs and they cite the local rule restricting regurgitated arguments in a motion for reconsideration.  Defs.' Opp'n to Pl.'s MSJ at 13 (citing L.R. 7-9(c)).

On the second point, O'Rourke highlights an "apparent inequity" that I noted in the Prior Order; namely "that pensioners' early retirement benefits would be suspended if they took a post-retirement position with IBEW Local 6 because it is covered employment, but not if they worked for the international union, even though both positions involve some level of organizing work." Prior Order at 20.  He contends that this statement is clear error because "covered employment" is employment during which an employee makes contributions to the Plan and accrues Plan benefits. Early pension benefits are suspended during covered employment because a participant should not be allowed to "simultaneously collect benefits and accrue additional credit to increase his benefit." Pl.'s MSJ at 15.  In contrast, a person such as O'Rourke who is employed by the international union does not accrue additional credits that increase his eventual benefits, therefore there is no "apparent inequity."  If he is not permitted to collect his pension while working for the international union, he suffers a "forfeiture" because he will never recoup those benefits.

Even if I ignore the procedural issues to address the merits of O'Rourke's arguments, it

would not change the outcome here.  My previous decision was constrained by the abuse of discretion standard, and O'Rourke has failed to identify any reason to reverse the conclusions in the Prior Order.  He excises particular lines from the Prior Order to morph previously argued issues into clear error arguments, but neither of the purported "misunderstandings" would or could have led to a different result. [15]

## C.    No Extraordinary Circumstances

O'Rourke argues that this case presents extraordinary circumstances because "no court has ever held that the exception for suspension of benefits by a multiemployer plan could be invoked against a pensioner who was working *for the union*."  Pl.'s MSJ at 15 (emphasis in original).  He insists that I should not allow defendants to invoke a provision intended to protect organized labor for the purpose of undermining organized labor.  *Id*.

O'Rourke relies on *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of Southern* California, 703 F.2d 386 (9th Cir. 1983), to insist that Congress intended the suspension of benefits provision to allow multiemployer plans to protect union jobs.  Hurn was receiving early retirement benefits when he accepted a nomination for the presidency of his local union, a nonpaying office.  *Id*. at 388.  Even though he was not elected, the trustees voted to suspend his benefits while he was running for office, under a rule that dictated suspension of retirement benefits for "anyone engaging in 'employment or activity,' including 'labor relations,' in the building and construction industry."  *Id*. at 390.  The Ninth Circuit held that the rule was arbitrary and capricious because the union did not pay its president or contribute to his retirement,

---

[15] The parties dedicated significant time and space in both rounds of briefing and during oral argument to the issue of whether ERISA's anti-forfeiture provision in section 203 applies to early retirement benefits.  The Ninth Circuit's first decision in the *Hurn* case suggests that defendants correctly assert that section 203 does not apply to early retirement benefits.  *See Hurn v. Ret. Fund Tr. of Plumbing, Heating & Piping Indus. of S. California*, 648 F.2d 1252, 1253–54 (9th Cir. 1981)(affirming the district court holding that Hurn could not state a claim under section 203 because he "was not 65 [normal retirement age] during the period he suffered the suspension of benefits"); *Hurn v. Ret. Fund Tr. of Plumbing, Heating & Piping Indus. of S. California*, 703 F.2d 386, 387 (9th Cir. 1983)(addressing Hurn's first case in which the court agreed with section 203(a)'s inapplicability but remanded to allow Hurn to file an amended complaint under section 302(c)(5) of the Labor Management Relations Act).  I am sympathetic to O'Rourke's argument that the Board's denial of his early retirement benefits amounts to a "forfeiture" in the sense that he can never recoup these benefits.  Although the issue of section 203's applicability does not dictate an outcome here, however, it strongly undercuts O'Rourke's  policy-based arguments.

so "Hurn would not affect anyone's job, wage, or benefits by winning office." *Id.*  In short, "[t]he Fund ... had no reasons to discourage his candidacy." *Id.*

Defendants distinguish *Hurn* because "O'Rourke is being well compensated as the Vice President of the IBEW, Ninth District." Opp'n to Pl.'s MSJ at 15 (citing O'Rourke Dep. at 117:10–13, Kang Decl., Ex. W; Dkt. No. 73).  The *Hurn* court noted that Hurn "needed his benefits, if anything, more than before because he now had the expense of campaigning to add to his other expenses[,]" but it also indicated that "[h]is need for benefits during his campaign would not have been reduced even were the presidency a paying office." 703 F.2d at 390.  For this reason, *Hurn* is not particularly helpful.  O'Rourke is handsomely compensated for his IBEW office, but that does not inevitably lead to the conclusion that he does not need his early retirement benefits.  *See id.*  But here, unlike in *Hurn*, the Board provided multiple reasons for denying O'Rourke's claim.  In addition to "prevent[ing] retirees from simultaneously receiving pension benefits and working in a position that might displace a non-pensioner[,]" AR 354, it also aims to treat all participants equitably by adhering to the four enumerated exceptions to the Prohibited Employment rule.

O'Rourke's representation "[t]hat a provision enacted by Congress expressly for the purpose of protecting organized labor is being invoked to undermine organized labor" is a bit hyperbolic.  The Board provided a "reasonable basis" for rejecting O'Rourke's claim, and a denial of claim benefits should not be equated to undermining organized labor.  It remains true that "[i]nterpreting the Plan to avoid inequity is a legitimate goal for a Board to pursue." Prior Order at 19.  And, just as I indicated in the Prior Order, I understand O'Rourke's position as well. *See* Prior Order at 24 (finding no abuse of discretion but "[t]his is not to imply that I would have interpreted the Plan in the same way as the Board."); *supra* note 15.  The parties were unable to locate any cases in which a participant in a multiemployer plan has forfeited his benefits by working for a union.  But, as the parties acknowledged, that does not mean this has never happened before.  And, more importantly, my conclusion is not "endors[ing]" a purported "inversion[.]" *See* Pl.'s MSJ at 16.  I am bound to apply the law, and the law dictates that the Board's "interpretation of Plan language is entitled to a high level of deference and will not be

disturbed unless it is not grounded on *any* reasonable basis." *Tapley v. Locals 302 and 612 of the Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013)(emphasis in original)(internal quotation marks omitted).

O'Rourke has not convinced me that my previous decision was in error, and he has not shown new evidence warranting a different conclusion. His motion for reconsideration is DENIED.

## II.    SUMMARY JUDGMENT ON CLAIM TWO[16]

O'Rourke brought his second claim pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which allows a plan "participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3). "[E]quitable relief under § 1132(a)(3) is not available if § 1132(a)(1)(B) provides an adequate remedy." *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 959 (9th Cir. 2016). Since O'Rourke is not entitled to recover for his denial of benefits claim under 29 U.S.C. § 1132(a)(1)(B), I will proceed to analyze the availability of equitable relief. I must preface this discussion with O'Rourke's admission that his facts "don't fit neatly" into other breach of fiduciary duty cases.

### A.    Whether the Board Acted As a Fiduciary Under ERISA

Defendants argue that the Board's decision not to amend the plan was a settlor function, not a fiduciary act. They further argue that "the breach of fiduciary duty pled in the Complaint does not stem from any alleged failures related to a Plan interpretation or implementation of an adopted Plan amendment[,]" so O'Rourke's claim must fail. Reply ISO Defs.' MSJ at 5 (Dkt. No. 78). "In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets." *Hughes Aircraft Co. v. Jacobson*, 525 U.S.

---

[16] Defendants statute of limitations argument is groundless. The undisputed evidence establishes that the Board continually tabled the issue of whether it would implement the September 2010 action. Even at the time the Board denied O'Rourke's application, the issue was still unresolved.

United States District Court
Northern District of California

432, 444 (1999); *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)("Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries."). But, if I accept O'Rourke's perspective of the facts, his claim is not based on the Board's purported failure to amend the Plan. He steadfastly maintains that the Plan did not need amendment at all because the September 2010 action was sufficient. Rather, his claim is based on the Board's failure to "implement" the September 2010 action—an act of plan *administration*. *See* Opp'n to Defs.' MSJ at 12.

Under ERISA,

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Here, the Board exercised its discretionary authority with respect to the disposition of the Plan's assets when it decided to deny O'Rourke's application for early retirement benefits because his IBEW employment fell within the definition of Prohibited Employment.

Contrary to defendants' contentions, the Prior Order does not foreclose this conclusion. I previously held that "[t]he September 2010 meeting did not result in a formal amendment to the Plan that the Board was thereafter required to follow." Prior Order at 21:23–24; *see also id*. at 25:5–7 ("This explanation [of why amendment required], plus the lack of clarity noted in the Appeal Denial Letter, reasonably demonstrates that the Board was not bound by the concept it approved at the September 2010 meeting."). But I went on to state, "[a]lthough the March 2014 Memo later noted that an amendment was not required, the Board *ultimately decided against that advice*." *Id*. at 22:7–8 (emphasis added).[17] I concluded that the Board did not abuse its discretion

---

[17] At least as late as December 23, 2014, the Plan Manager indicated that "the Trustees were unable to agree on whether that employment constitutes prohibited employment under the Plan." 12/23/14 Letter from Fisher (Kang Decl., Ex. p; Dkt. No. 63-17). From this letter, it appears that the decision contemplated by the Board was not whether or not to amend the Plan, but whether or not O'Rourke's employment with the IBEW constituted Prohibited Employment. Fisher's deposition testimony suggests that his application would not be approved absent an amendment.

1  when it chose not to exempt IBEW work from the Prohibited Employment Rule because the Plan

2  had not been amended to include such an exemption. *Id.* at 22. Nonetheless, it could have

3  breached its fiduciary duty when it rejected the advice of counsel and determined that an

4  amendment was necessary to effectuate the September 2010 action.

5      In short, the gravamen of O'Rourke's challenge is not the Board's decision *not to amend*

6  the Plan; it is the Board's determination of his pension application, which was based on its view

7  that *an amendment was required* to conclude that IBEW work was exempted. I found that the

8  Board did not abuse its discretion when it determined that an amendment was required, but that

9  conclusion does not foreclose the possibility that the Board was acting as a fiduciary when it made

10 that decision. "[A]n employer's obligations as an ERISA fiduciary are not suspended while it

11 considers a proposal to amend an existing ERISA plan or to adopt a replacement plan." *Bins v.*

12 *Exxon Co. U.S.A.*, 220 F.3d 1042, 1047–48 (9th Cir. 2000); *but see id.* at 1053 ("[A]n employer's

13 serious consideration of a change to a plan does not, in and of itself, implicate ERISA's fiduciary

14 duties.").

15     The Board's fiduciary duties, outlined in 29 U.S.C. § 1104, remained in effect as it

16 contemplated whether an amendment was required to administer the funds in the manner sought

17 by O'Rourke's application. O'Rourke has at least presented a triable issue of fact as to whether

18 the Board ignored its duty to act on the September 2010 action. Defendants' first argument falls

19 short. I will accept O'Rourke's position that the Board acted as a fiduciary when it denied his

20 claim, and proceed to address the parties' remaining arguments.

21     **B.    O'Rourke Was Informed**

22     O'Rourke argues that the Board breached its fiduciary duty by failing to keep him

23 informed of the status of the September 2010 action. He correctly asserts that the Board

24 repeatedly tabled the issue of the September 2010 action and was in a veritable "state of

25 paralysis[.]" Pl.'s Opp'n at 12. But he incorrectly translates this inaction into a failure to inform

26 him.

27

28 Fisher Dep. at 29:20–30:13. O'Rourke, however, describes this testimony as her
"misconceptions." Pl.'s Opp'n to Defs.' MSJ at 4–6.

As an initial matter, O'Rourke fails to cite any precedent that the Board had a duty to inform him on the status of the September 2010 action. Defendants, on the other hand, cite to *Bins v. Exxon Co. U.S.A.* for the proposition that "[t]he Board's only obligation to inform O'Rourke was to answer forthrightly any questions when he posed them[.]" Defs.' MSJ at 17 n.6 (citing *Bins*, 220 F.3d 1042 (9th Cir. 2000)). The *Bins* court held that, "an ERISA fiduciary does not have an affirmative duty prior to final approval and general dissemination of plan changes to volunteer information to employees who have not specifically alerted the fiduciary to the fact that such information is material to them." 220 F.3d at 1053. But "[i]f an employee, in the course of inquiring about possible plan changes, asks to be kept abreast of any changes in the status of a potential change and the employer provides assurances to that effect, then the employer will have a fiduciary duty to follow up with that employee." *Id.* at 1054.

O'Rourke does not contend that he "ask[ed] to be kept abreast of any changes[.]" But he aims to distinguish *Bins* because, in his case, "there was no question of a future benefit improvement." Pl.'s Opp'n at 13. He insists that "the fiduciaries were well aware that [he] had relied on the September 2010 action in accepting the position with the International[.]" *Id.* And from this premise, he argues that the Board had a duty to provide him with complete and accurate information. But in the absence of any precedent establishing the basis for such a duty, I cannot conclude that the Board had such a duty, until he specifically inquired about his benefits through his application.

Even if I were to find a duty to inform, the undisputed evidence demonstrates that he was fully informed on the status of the September 2010 action via reports from plan manager Fisher and trustee Donovan. O'Rourke Dep. at 109:14–110:23; Donovan Dep. at 83:5–16, *id.* at 91:8–23; *see also* 2014 Letters from Fisher to O'Rourke (Kang Decl., Exs. M, U). He claims that these reports "did him no good." But the fact that he was unhappy with the information he received does not negate the fact that he received the information. O'Rourke has no basis to state a claim for breach of fiduciary duty based on a failure to inform.

### C. O'Rourke's Equitable Estoppel Theory Fails

"A beneficiary may recover benefits under ERISA based on an equitable estoppel theory, if

he shows: (1) a material misrepresentation; (2) reasonable and detrimental reliance on the representation; (3) extraordinary circumstances; (4) the provisions of the plan at issue are ambiguous, such that reasonable persons could disagree as to their meaning or effect; and (5) the representations must have been made to the beneficiary involving an oral interpretation of the plan." *Renfro v. Funky Door Long Term Disability Plan*, 686 F.3d 1044, 1054 (9th Cir. 2012).[18] A beneficiary cannot recover under an estoppel theory "in the face of contrary, written plan provisions." *Davidian v. S. California Meat Cutters Union and Food Employees Ben. Fund*, 859 F.2d 134, 134 (9th Cir. 1988).

Defendants argue that O'Rourke cannot establish that they made any misrepresentations to him, that he reasonably relied on any misrepresentations, or that extraordinary circumstances exist. Defs.' MSJ at 18. O'Rourke insists that a misrepresentation is not necessary; rather, "what is fundamentally required is a promise to which equity demands a fiduciary be held, and that does not contradict the plan's written terms." Opp'n to MSJ at 14. But O'Rourke aims to stretch estoppel principles a bit too far.[19] He cannot identify a misrepresentation because there was none. He held one perspective on the results of the September 2010 action, but the Board ultimately decided a different interpretation was warranted. I previously concluded that this decision was not an abuse of discretion. Neither does it amount to a misrepresentation.

### D. O'Rourke's Is Not Entitled to Reformation

In *Skinner v. Northrop Grumman Ret. Plan B*, the Ninth Circuit expressed uncertainty as to "whether [it] should analyze reformation in the context of trust law or contract law because retirement plan documents are similar to both trusts and contracts." 673 F.3d 1162, 1166 (9th Cir. 2012). But either way, "reformation is proper only in cases of fraud and mistake." *Id.*

---

[18] O'Rourke elects to cite a different standard for his equitable estoppel claim, extracted from a Ninth Circuit case quoting an Eleventh Circuit case, and discussing the claim in the context of a preemption analysis. *See* Pl.'s Opp'n To MSJ at 13 (quoting *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir. 1992), which, in turn, quoted *Alday v. Container Corp.*, 906 F.2d 660, 666 (11th Cir. 1990)). I choose to adopt a more recent recitation of the elements of equitable estoppel, which subsumes the two elements indicated in *Greany*.

[19] I agree with him that he may have justifiably relied on his own understanding of what the September 2010 action accomplished, but this is not enough to establish his right to recover under an estoppel theory.

I already concluded that "the Board's interpretation does not conflict with the Plan's plain language, render any term nugatory, or lack a rational connection to the Plan's purpose." Prior Order at 24:2–3. O'Rourke, however, argues, "[t]o the extent that the Plan terms permitted the Board to interpret the Plan contrary to the September 2010 action, the Plan terms contain a mistake, in that the parties did not intend the Plan to prohibit early retirees from working for the International union." Pl.'s Opp'n at 15. But he fails to demonstrate a disputed fact as to whether the Plan contains a mistake. After he left, the Board reasonably determined that the 2010 Action would require a Plan amendment, and it ultimately voted against that Amendment. This is insufficient to demonstrate that the Plan terms contain a mistake.

O'Rourke has not presented evidence establishing triable issues of fact regarding his breach of fiduciary duty claim. Defendants' motion for summary judgment is GRANTED.

## CONCLUSION

As mentioned throughout this order and the Prior Order, I am sympathetic to O'Rourke's position. But his perception of unfair treatment is insufficient to garner a legal right to recovery. Defendants' motion for summary judgment is GRANTED. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: November 2, 2017

William H. Orrick
United States District Judge